| | |
|---|---|
| **WILLIAM B. BARNETT AND** **AMELIA BARNETT** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-1928** |
| **FRANK J. D'AMICO, JR., ET. AL.** | **SECTION "B"(5)** |

## OPINION

Following oral argument, and with the consent of the parties, the Court converted the instant interpleader action to trial on the briefs. (Rec. Doc. No. 146). After a review of the record submitted by the parties, and for the reasons articulated below,

**IT IS ORDERED** that:

Interpleader-Defendant D'Amico be **GRANTED LIEN PRIORITY** for **$52,538.56** of the interpleader funds at issue, plus any interest that has been earned on that amount while in the registry of the court, less any court administration fees;

Interpleader-Defendant D'Amico be permitted to submit a detailed briefing, within 30 days of this order, with supporting documentation establishing the exact amount of interest he has incurred as a result of the loans he made the Barnetts that the Court has granted superpriority. Any party wishing to respond to that briefing may do so within 14 days of its filing;

The law firm Fowler, Rodriguez & Chalos, LLP be **GRANTED LIEN PRIORITY** for **$6,133.33** plus any interest that has been

1

earned on that amount while in the registry of the court, less any court administration fees;

The United States be **GRANTED LIEN PRIORITY** to the remainder of the interpleader funds after the issue of D'Amico's entitlement to interest is resolved, or after 30 days of the issuance of this order if no further briefing is filed.

### Procedural History

The instant interpleader action concerns the competing claims of various claimants to funds in the total amount of $550,000. The funds are proceeds from the settlement of an action by William and Amelia Barnett against the Lincoln General Insurance Company.[1] The interpleader action followed when various creditors made claims to the settlement proceeds.

The action originally arose in state court, with the funds at issue being deposited in the registry of the 22nd Judicial District Court, St. Tammany Parish. The action was thereafter removed to this Court, which maintains jurisdiction under Title 28, United States Code, sections 1442(a)(1) and 1444.

### I. Claimants to Funds

Currently, four claimants remain before the Court. They are: (1) Frank J. D'Amico, Jr., individually, and Frank J. D'Amico, Jr., APLC, (collectively referred to as "D'Amico"); (2)

---

[1] Of the total funds, $325,000 stem from the settlement of William Barnett's claims, and the remaining $225,000 stem from the settlement of Amelia Barnett's claims.

the United States of America; (3) Fowler, Rodriguez & Chalos, LLP; and (4) Clement Dennis. Several other defendants were named in the interpleader action but have either disclaimed a right to the funds or have been defaulted.[2]

D'Amico represented the Barnetts in the suit against Lincoln General Insurance Company that resulted in the settlement giving rise to the interpleader funds. D'Amico asserted a claim in excess of the interpleader amount for attorney fees, costs of litigation, and various additional personal advances that he made to or on behalf of the Barnetts.

Fowler, Rodriguez & Chalos, LLP also previously represented the Barnetts in their damages litigation, and asserted a total claim to the interpleader funds of $14,088.91.

The United States asserted a claim for assessments made by the Secretary of the Treasury against the Barnetts for unpaid federal income taxes, penalties, and interest for the 2002 tax year in the amount of $409,394.86.

Clement Dennis asserted a lien against the interpleader funds in the amount of $16,712.46 for a judgment he obtained against William Barnett on October 3, 2007, and which Dennis

---

[2] Specifically, the other interpleader defendants as named in the original state court petition were: Capitelli & Wicker, PLC; Discon Law Firm; Linda Sharpe; RS Medical; and Blue Cross Blue Shield of Louisiana. (Rec. Doc. No. 1-1 at 1-2).

filed in the records of the clerk of court for St. Tammany
Parish that same day. (Rec. Doc. No. 9 at ¶ 19).

## II. **Previous Withdraw of Funds**

With the consent of the United States, judgment was
previously entered in D'Amico's favor on March 22, 2011. The
prior judgment held that D'Amico is entitled to payment of the
following amounts in priority to all the other claims raised in
this interpleader, including the federal tax liens: (1) $113,750
as the contingency fee related to William Barnett's settlement;
(2) $26,068.11 in litigation costs and expenses related to
William Barnett's settlement; (3) $78,750 as the contingency fee
related to Amelia Barnett's settlement; and (4) $6,214.12 in
litigation costs and expenses related to Amelia Barnett's
settlement. (Rec. Doc. No. 26). D'Amico has received payment
from the interpleader funds for those amounts, leaving
$325,217.77 remaining in the interpleader.[3]

## III. **Pending Claims**

In addition to those amounts he has already been awarded,
D'Amico made claims for personal advances that he made to or on
behalf of the Barnetts. Those advances total in excess of

---

[3] This remaining amount represents $185,181.89 remaining to be distributed in
relation to Mr. Barnett's settlement proceeds and $140,035.88 remaining to be
distributed in relation to Mrs. Barnett's settlement proceeds.

$500,000.[4] The United States opposed, arguing D'Amico does not have priority over other defendants for the advances he made the Barnetts. D'Amico and the United States each filed motions for summary judgment seeking withdrawal of funds.

The United States, in its motion for summary judgment, argued that $6,133.33 of the interpleader funds should be paid to Fowler, Rodriguez & Chalos, LLP, and the remaining interpleader funds should be applied toward the outstanding 2002 federal income tax liability of William and Amelia Barnett and paid to the United States. The United States further argued that D'Amico and Dennis are entitled to no further funds.

D'Amico countered that he is entitled to be paid for the advancements he made to the Barnetts, and that his claim for additional funds enjoys priority over all other creditors.

Neither Fowler Rodriguez nor Dennis filed their own motion for summary judgment nor responded to the United States' or D'Amico's motions for summary judgment.

The Court heard oral argument on July 9, 2014. Counsel for D'Amico and the United States agreed at oral argument that, although certain factual issues remained in dispute, the Court could decide the matter without trial. Thereafter, the Court, without objection from any party, converted the pending motions

---

[4] The Court previously denied a similar request for withdrawal of the funds without prejudice, pending completion of discovery. (Rec. Doc. No. 62).

for summary judgment to trial on the briefs and allowed parties to make supplemental filings into the record. *See M/G-T Servs. Inc. v. Turn Serv. Inc.*, 2002 WL 27765 (E.D. La. Jan. 8, 2002) (converting motions for summary judgment to trial on the briefs with consent of parties).

**Relevant Law**

This action asks the Court to navigate the intersection between the federal tax code's provisions on lien priority, and Louisiana's ethical rule permitting attorneys to provide monetary advancements to their clients. D'Amico and the United States dispute the applicability of Louisiana's law permitting client advancements to federal lien priority in the instant case. The Court therefore begins by reviewing both areas of substantive law.

**I. Federal Lien Priority**

Federal tax law provides a tax lien in favor of the United States in the amount of any unpaid taxes, including any interests or penalties. 26 U.S.C. § 6321. The lien arises at the time an assessment is made and continues until the amount is satisfied. *Id*. at § 6322. The United States may perfect its lien by filing notice in the state office where the taxpayer's property subject to the lien is located. *Id*. at § 6323(f)(1)(A). The lien attaches to all property belonging to the delinquent

taxpayer, including after-acquired property. *Id.* at § 6321; *U.S. By & Through I.R.S. v. McDermott*, 507 U.S. 447, 448 (1993).

Where a party other than the United States also maintains a lien against the taxpayer, lien priority is generally governed by the common-law principle of "the first in time is the first in right." *McDermott*, 507 U.S. at 449 (quoting *United States v. City of New Britain*, 347 U.S. 81, 85 (1954)). A competing state lien is first in time "only when it has been 'perfected' in the sense that 'the identity of the lienor, the property subject to the lien, and the amount of the lien are established.'" *Id.* (quoting *City of New Britain* at 84).

However, the Internal Revenue Code provides an exception to the first in time rule for certain attorney liens. Broadly speaking, this rule of "superpriority" ensures that attorneys who litigate a successful settlement or judgment on behalf of a delinquent taxpayer are paid ahead of a federal tax lien. As pertinent to this action, the rule of superpriority provides that:

> Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid . . . [w]ith respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment or procuring such settlement . . . .

> 26 U.S.C. § 6323(b)(8)

Initially, the superpriority provision may appear to be for the sole benefit of attorneys—but this interpretation is misguided. Properly understood, the provision is not a grant of priority to advantage attorneys, but instead to benefit the government. *Hill, Christopher & Phillips, P.C. v. United States Postal Service,* 535 F.Supp. 804, 810 (D.D.C.1982); *United States v. Ripa*, 323 F.3d 73, 83 (2d Cir. 2003). The purpose of the superpriority provision "is to provide an incentive to attorneys to enhance the value of a taxpayer's property, which would ultimately increase the government's revenue collection." *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 643 (5th Cir. 2002). In enacting the provision, Congress hoped "to encourage attorneys to bring suits that may benefit the Treasury" by making it more likely that delinquent taxpayers would be able to satisfy their debt with litigation proceeds. *Montavon v. United States*, 864 F. Supp. 519, 523 (E.D. Va. 1994).

Without the superpriority provision attorneys would be unlikely or unwilling to expend efforts seeking monetary relief that the government would ultimately be entitled to. *Id*. The superpriority provision ensures that attorneys are compensated for their efforts in enhancing the value of property subject to government tax liens, while at the same time allowing the government to ultimately reap the benefits of the attorney's efforts by increasing the likelihood that the lien will be

satisfied, or at least paid in part. Although the superpriority provision means the government must forego some proceeds it would have ordinarily been entitled, "Congress recognized that part of something is better than all of nothing." *Id.* Encouraging attorneys to bring suits on behalf of individuals subject to tax liens was Congress's pragmatic way of ensuring the lien's value increased.

With that purpose in mind, it is no surprise that the right to superpriority is not unlimited, nor is it automatic. Superpriority is available only to those "attorneys whose efforts result in obtaining or collecting judgments or settlements" and should only extend "to their reasonable fees to the extent that the fees are protected under local law." 1966 U.S.C.C.A.N 3722, 3727. To benefit from superiority an attorney must establish: "(1) that a fund was created out of a judgment or settlement of a claim; (2) that local law would recognize the existence of a lien; and (3) that the amount of the lien reflects the extent to which their efforts reasonably contributed to the award." *Markham v. Fay*, 1993 WL 160604, at *6 (D. Mass. May 5, 1993) (internal citations omitted).

## II. Louisiana Law on Client Advancements

Nearly all states prohibit attorneys from giving non-litigation related monetary advances to their clients. Restatement (Third) of Law Governing Law § 36, Reporter's Note

Comment c (2000); *see also* Jack P. Sahl, *The Cost of Humanitarian Assistance: Ethical Rules and the First Amendment*, 34 St. Mary's L.J. 795, 822 (2003) (describing various states' ethical rules on client advancments). The American Bar Association's Model Rules explicitly prohibits the practice—with the exception of court costs and litigations expenses, or where the client is indigent. ABA Model Rule of Professional Conduct 1.8(e).[5] The Restatement of the Law Governing Lawyers similarly prohibits lawyer to client loans, except for court and litigation expenses. Restatement (Third) of Law Governing Law § 36(2) (2000).[6]

Louisiana however is uniquely permissive in the authority it grants attorneys to lend money to clients, and the subsequent lien priority the state grants attorneys who make such advancements.[7] Under Louisiana law, an attorney's "fee" for privilege purposes is defined as "the agreed upon fee, whether fixed or contingent, and *any and all other amounts advanced by*

---

[5] The Comment to the ABA rule states that allowing such advancements "would encourage clients to pursue lawsuits that might not otherwise be brought" and are disfavored "because such assistance gives lawyers too great a financial stake in the litigation." Comment 10, ABA Model Rule of Professional Conduct 1.8.

[6] The Comment to the section states "[l]awyer loans to clients are regulated because a loan gives the lawyer the conflicting role of a creditor and could induce the lawyer to conduct the litigation so as to protect the lawyer's interests rather than the client's." Comment c, Restatement (Third) of Law Governing Law § 36 (2000).

[7] As the Comment to Louisiana Rule 1.8 states, the rule "diverges significantly" from the ABA Model Rules. Comments to Paragraph (e), La. Rule Prof. Conduct 1.8.

*the attorney to or on behalf of the client*, as permitted by the
Rules of Professional Conduct of the Louisiana State Bar
Association." La. Rev. Stat. Ann. § 37:218 (emphasis added).
Rule 1.8 of the Louisiana Rules of Professional Conduct, in
turn, permits an attorney to supply "[i]n addition to costs of
court and expenses of litigation . . . financial assistance to a
client." La. Rule Prof. Conduct 1.8(e)(4). The financial
assistance may include the "minimum sum necessary to meet the
client's, the client's spouse's, and/or dependents' documented
obligations for food, shelter, utilities, insurance, non-
litigation related medical care and treatment, transportation
expenses, education, or other documented expenses necessary for
subsistence." *Id*. at 1.8 (e)(4)(iv).[8]

However, restrictions do apply. In addition to limiting
advancements to the "minimum sum necessary," the rule also
requires the attorney to first determine that the lack of
"financial assistance, would adversely affect the client's
ability to initiate and/or maintain the cause for which the
lawyer's services were engaged." *Id*. at 1.8 (e)(4)(i),(iv).
Further, the advancement "shall not be used as an inducement by
the lawyer, or anyone acting on the lawyer's behalf, to secure

---

[8] Although the practice of lending clients money for living expenses has been
long established in Louisiana, *see*, *e.g.*, *Louisiana State Bar Ass'n v.
Edwins*, 329 So. 2d 437, 446 (La. 1976), Rule 1.8 was only more recently
amended in 2006 to specifically allow the practice. *See* Comments to Paragraph
(e), La. Rule Prof. Conduct 1.8.

employment." *Id*. at 1.8 (e)(4)(ii). Lastly, where these advancements are made, the attorney must "procure the client's written consent to the terms and conditions under which such financial assistance is made." *Id*. at 1.8 (e)(5)(v).[9]

## Analysis

The United States holds federal tax liens against the interpleader funds at issue for the Barnetts' joint federal income tax liability for 2002. A Notice of Federal Tax Lien was filed against William B. Barnett and Amelia Barnett with the Clerk of Court of St. Tammany Parish, Louisiana, on May 23, 2005, with respect to their 2002 federal income tax liability. That lien attaches to all of the Barnetts' property, including property acquired after the lien was assessed—such as the settlement funds at issue here. *U.S. By & Through I.R.S. v. McDermott*, 507 U.S. 447, 448 (1993). No party disputes that the lien is valid, nor does any party claim that their state lien was perfected prior to the United States' lien. *See Id*. at 449. Accordingly, the United States maintains priority over all other creditors—absent a statutory grant of superior priority. *Id*.

---

[9] The wisdom of the Louisiana's Rule permitting such advancements has divided scholars. *See generally* Danielle Z. Cohen, *Advancing Funds, Advancing Justice: Adopting the Louisiana Approach*, 19 Geo. J. Legal Ethics 613 (2006); Wendy Watrous, *Lawyer or Loan Shark? Rule 1.8(e) of Louisiana's Rules of Professional Conduct Blurs the Line*, 48 Loy. L. Rev. 117 (2002).

**I. Dennis' Claim for Lien Priority**

Clement Dennis' claim for lien priority is easily dismissed. Dennis filed his lien October 3, 2007—well after the United States filed its lien on May 23, 2005. Accordingly, the United States' lien was first in time, and must be paid in priority over Dennis' lien. Dennis has not filed a motion for summary judgment, or responded to the motions before the Court. Accordingly, he has conceded to the United States' argument that he lacks priority to the funds. Further, after independent review, there appears no reason why Dennis' lien would maintain priority over the United States' lien. Thus, he maintains no right to the funds at this time.

**II. D'Amico's Claim for Lien Priority**

D'Amico claims superpriority over the United States' lien pursuant to 26 U.S.C. § 6323(b)(8). Relying on that provision, D'Amico argues that repayment for his monetary advancements to the Barnetts qualifies as a valid lien under state law and, consequently, satisfies the federal superpriority provision as an attorney's "reasonable compensation for obtaining" settlement. *Id*.

Whether repayment for the type of monetary advancements made by D'Amico fits within the definition of "reasonable compensation" in the federal superpriority provision is a matter

of first impression. The parties agree that no court has reached the issue.

The United States argues that repayment for attorney advances to clients is not entitled to superpriority. Specifically, it argues that the superpriority provision is limited to those fees that encompass "the usual understanding of an attorney's compensation for the *legal services* that are the hallmark of the attorney's trade." (Rec. Doc. No. 126-4 at 9). The United States concludes that providing monetary loans to clients is not a typical legal service, and therefore repayment for such loans may not receive superpriority. The Court rejects this argument.

The United States offers no citation to authority in support of its position that state authorized attorney advancements are excluded from the superpriority provision. Instead, the government relies on its own definition of "legal services." The Court finds no support for this limited definition. Rather, in Louisiana and the other states that permit attorney advances, legal services will often include personal advancements to the clients to further litigation.

The United States essentially asks the Court to develop a federal common law rule that repayment for personal advancements cannot constitute "reasonable compensation for obtaining"

judgment or settlement, or be part of an attorney's fee. While tempting, the Court declines the invitation.

Courts should be wary of developing new federal common law rules. *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 87 (1994). This is particularly true where the federal statute at issue effects areas of law traditionally reserved to the states. *See De Sylva v. Ballentine,* 351 U.S. 570, 580 (1956) (interpreting the federal Copyright Act in light of state domestic law and noting "[t]he scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law.").[10] The Court is even more cautious to develop a new federal rule in the present case for three reasons.

First, the superpriority provision specifically points to state law for determination of the lien's validity. 26 U.S.C. § 6323(b)(8). State law, in turn, permits the type of advances herein, and specifically includes amounts advanced in the state law definition of attorney's fees. La. Rev. Stat. Ann. § 37:218.

Second, the general rule in interpreting federal tax law is to look to state law to determine the legal interest that an

---

[10] Even where no statutory languages commands looking to state law, interpretation of federal statutes often incorporate state law as the federal rule of decision. *See*, *e.g.*, *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728 (1979).

individual has in property. *United States v. National Bank of Commerce*, 472 U.S. 713, 722 (1985). After a determination on the property interest is made, then the Court looks to federal law to determine the consequences that attach to the state property rights—including lien priority. *Aquilino v. United States*, 363 U.S. 509, 513-14 (1960) ("[O]nce the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.'"). Accordingly, applying the general rule, the Court looks to Louisiana to determine the validity of D'Amico's lien. Because Louisiana permits a lien in favor of an attorney who extends personal advances to their client, the superpriority provision does not categorically exclude the property interest an attorney has in such lien.

Third, the Court finds no specific conflict between federal and state law in the instant case—a necessary prerequisite for developing a federal common law rule. *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 87 (1994); *Atherton v. F.D.I.C.*, 519 U.S. 213, 218 (1997). To the contrary, the Court finds that the purpose of the superpriority provision is in fact *supported* by the Louisiana client advancement provision.

The purpose of the superpriority provision is to encourage attorneys to pursue litigation and "ultimately increase the

government's revenue collection" by obtaining a higher settlement or judgment. *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 643 (5th Cir. 2002). Similarly, the Louisiana rule permitting client advancements is aimed at increasing the ultimate recovery for identifiable clients in established necessitous circumstances. As the Supreme Court of Louisiana stated in *Louisiana State Bar Ass'n v. Edwins*, 329 So. 2d 437 (La. 1976)—the decision that eventually led to the modifications to Rule 1.8 permitting client advancements:

> If an impoverished person is unable to secure subsistence from some source during disability, he may be deprived of the only effective means by which he can wait out the necessary delays that result from litigation to enforce his cause of action. He may, for reasons of economic necessity and physical need, be forced to settle his claim for an inadequate amount.

*Id*. at 446.[11]

Thus, the superpriority provision and the advancement rule share the same goal—encouraging higher client recovery. By allowing attorneys to advance funds to a client who would not otherwise

---

[11] As one commentator further expounded:

> [T]he Louisiana approach protects citizens' constitutional right of access to the courts. A client often will not be able to pursue a claim if he is unable to pay his most basic living expenses. Instead, the client may be forced to settle for an unjustified amount because he can not afford to continue carrying on the lawsuit. Allowing generous lawyers to advance clients money can bolster this constitutional right and help to prevent such grave injustice.

Danielle Z. Cohen, *Advancing Funds, Advancing Justice: Adopting the Louisiana Approach*, 19 Geo. J. Legal Ethics 613, 626 (2006) (internal citation omitted).

be able to sustain a lengthy lawsuit, litigation can proceed until a favorable result is reached—ultimately increasing the suit's value, and simultaneously fulfilling the superpriority provision's goal by enhancing the government's likelihood of full recovery on the lien amount. That being the case, the Court finds no reason why repayment for advancements should be excluded from the reasonable compensation provision of the superpriority statute.[12]

The Court next moves to an analysis of whether D'Amico's advances complied with Louisiana law—entitling him to take advantage of federal lien priority.

Many of the advancements are easily denied superpriority as they fail to comply with Louisiana's provision on client consent. As stated above, an attorney making advancements to a client must "procure the client's written consent to the terms and conditions under which such financial assistance is made." La. Rule Prof. Conduct 1.8(e)(5)(v). Here, D'Amico's fee agreement with the Barnetts contains authorizations for litigation expenses, but does not authorize separate living advancements. (Rec. Doc. No. 120-8 at ¶ 2). The fee agreement form has a section stating "Advance required", but the space

---

[12] In acknowledging Louisiana's unique rule we also suggest need for further review of that rule in modern times and circumstances. At present, the rule gives general rationale for its extensive application, without corresponding detailed means for enforcement and review. A study of how the rule is applied and regulated, with specific examples of the positives and negatives, would be helpful.

next to the "No" box is marked on the Barrnetts' agreement. (*Id.*)

Separately, D'Amico obtained a written authorization from William Barnett, again authorizing litigation expenses but also authorizing medical expenses for William Barnett during litigation. (Rec. Doc. No. 120-8 at 4).[13] Additionally, D'Amico obtained a number of written authorizations for client advancements from the Barnetts for specific amounts on certain specific dates. *See* (Rec. Doc. No. 120-10).

However, most of the advancements now claimed by D'Amico are not accounted for by these separate written authorizations. During deposition testimony, D'Amico conceded that the missing forms were an oversight by his office, and that—although a signed form prior to every advancement was ideal—his office often failed to obtain the forms. (Rec. Doc. No. 120-7 at 34-36).

Without the forms, the additional authorizations are noncompliant with Louisiana Rule 1.8, and therefore may not qualify for lien priority under either Louisiana law or the federal superpriority provision. D'Amico counters that forcing him to provide authorization for each advancement is not required by the rule. This argument misses the point. The rule

---

[13] Although the agreement has two lines for client signature, only William Barnett signed the document.

may very well permit a blanket clause in a fee agreement that would allow unlimited living advances by an attorney to a client—similar to the blanket consent D'Amico obtained for litigation costs, and from William Barnett for medical expenses. However, as noted above, D'Amico's fee agreement with the Barnetts contained no such authorization. Instead, it was D'Amico who choose to obtain consent on an advancement-by-advancement basis. In so doing, D'Amico only had proper consent for the specific amounts listed in the advancement forms.

Even if the Court did not interpret the consent requirement to necessitate written consent for the remaining advancements, the Court would still not accept many of D'Amico's claims for the further superpriority. Much of the submitted evidence of record fails to establish the amounts advanced, raises serious credibility concerns, and fails to adequately substantiate D'Amico's claim to superpriority.

To establish the amounts advanced, D'Amico submits two spreadsheets listing the advancement totals over several years. (Rec. Doc. Nos. 144-2, 144-3). These spreadsheets raise more questions than answers. Of the various categories listed in the spreadsheets, two of the categories are denoted as "NOT UPDATED." (Rec. Doc. Nos. 144-2 at Cells C35, C42; 144-3 at Cells C40, C51). Another category lists "Tina please update." (Rec. Doc. No. 144-3 at Cell D28). Another states "POSSIBLE

LIENS – BALANCES DUE MUST BE CONFIRMED." (*Id.* at A105). Still another merely lists as the amount "??" (*Id.* at A107).[14] This record keeping gives the Court no confidence that the advancements were in fact made in the amounts listed; that the amounts were limited to the "minimum sum necessary to meet the client's, the client's spouse's, and/or dependents' documented obligations," La. Rule Prof. Conduct 1.8(e)(4); or that the amounts constitute "*reasonable* compensation for obtaining" settlement. 26 U.S.C. § 6323(b)(8) (emphasis added).[15]

In addition, some of D'Amico's claims are for advances that he made *after* he obtained the settlement at issue—which occurred in April of 2010. These amounts cannot qualify for superpriority because none of those advances were shown to have contributed to "obtaining" the settlement, which already existed. § 6323(b)(8).

Further, D'Amico seeks priority for repayment of certain litigation expenses from the time when he represented the Barnetts, *See*, *e.g.*, (Rec. Doc. Nos. 144-2 at Cells A18-A24)

---

[14] D'Amico had adequate time to update these amounts. The most recent spreadsheets—submitted to the Court on July 23, 2014 and listed as "updated" on July 7,2014—are almost identical to the spreadsheets submitted to the Court in October of 2013, and include the same exact descriptions of cells not being updated. *Compare* (Rec. Doc. Nos. 144-2 and 144-3) *with* (Rec. Doc. No. 105-4).

[15] D'Amico's expense records also, at times, conflict with prior versions of the same records and/or responses during litigation without explanation. When asked in deposition why he originally claimed $26,068.11 in litigation/miscellaneous expenses, only to later claim $42,013.39 for the same services, he stated he could not explain the discrepancy other than to speculate that different paralegals had prepared the two documents. (Rec. Doc. No. 120-7 at 38-39).

(listing as litigation expenses "copies", "courier",
"deposition", "expert", and "travel" from 2007-2010), despite
the fact that he has already received payment from the
interpleader fund in excess of $200,000 for litigation expenses.
*See* (Rec. Doc. No. 26). D'Amico offers no explanation in his
most recent filing as to why he is seeking further litigation
expenses now from that time period—years after he was originally
awarded payment. Nowhere is his briefing to date has D'Amico
even attempted to illustrate that these amounts are different
from the fees he has already been awarded. Indeed, following the
Court's review, it is clear D'Amico is either seeking double
recovery of certain amounts or otherwise is remiss in accounting
for claimed amounts.

When comparing the original spreadsheets D'Amico submitted
in 2011 for litigation expenses (expenses ultimately approved by
the Court in its March 22, 2011 Order) with the most recent
spreadsheet submitted by D'Amico, several amounts are listed
exactly the same on both sheets. For example, both the 2011
sheet and the 2014 sheet for Amelia Barnett list a deposition
taken on June 1, 2009 as costing $577.75. *See* (Rec. Doc. No. 18-
5 at Cell E17); (Rec. Doc. No. 144-2 at Cell E22). Similarly,
"travel" on November 20, 2007 is listed on both sheets as
costing $43.67. (Rec. Doc. No. 18-5 at Cell E19); (Rec. Doc. No.

144-2 at Cell E24).[16] These amounts, listed identically on both sheets without notation on the 2014 sheet that the amounts were already satisfied by the Court's 2011 Order, leads only to the conclusion that D'Amico seeks priority for amounts already paid.

D'Amico also seeks compensation for fees incurred after he discontinued his representation of the Barnetts. In his most far-reaching claim, D'Amico asks for certain litigation costs through 2014. Although this claim is not explained, it appears that D'Amico is seeking recovery for the fees he incurred as a result of filing the instant motion. As should appear obvious, D'Amico is not entitled to take advantage of the federal attorney superpriority provision for expenses that he incurred years after representing the party to whom the federal tax lien is levied against, and after the settlement funds were created. *See* § 6323(b)(8) (superpriority valid only "to the extent of his

---

[16] Other amounts are listed slightly differently on each sheet, but provide a strong inference that double recovery is sought. For example, under "Expert" on William Barrnetts' 2011 sheet the date is listed with the dates "4/24/07-1/14/10" and the amount "$14,983.16." (Rec. Doc. No. 18-4 at Row 20). In the 2014 sheet, "Expert" is listed as "4/24/07-11/10/10" and costing "$16,783.16." (Rec. Doc. No. 144-3 at Row 22). It is unclear whether or not these amounts represent two separate experts, or whether (more likely) the higher amount represents work the expert completed from January through November. Regardless of which is in fact the case, D'Amico's failure to explain similar amounts—and failure to note that he was already awarded $14,983.16 in expert costs—makes it impossible for the Court to make a determination on what amount has yet to be paid. Moreover, D'Amico's record-keeping as a whole leads the Court to find he is incredible as to the amounts he reports—providing further reason to question whether the amounts submitted in fact accurately represent "reasonable compensation for obtaining" the settlement at issue. 26 U.S.C. § 6323(b)(8).

reasonable compensation *for obtaining such judgment or procuring such settlement* . . . .") (emphasis added).

Moreover, D'Amico additionally claims litigation expenses for items that had nothing to do with either the settlement in particular or the damages litigation overall. Specifically, D'Amico claims expenses related to separate bankruptcy litigation involving the Barnetts, and court costs related to the dissolution of a business in which the Barnetts previously were involved. (Rec. Doc. No. 144-3 at Cells A31-32); (Rec. Doc. No. 120-7 at 41). These amounts are unrelated to the Barnetts' damages action, and cannot be said to have helped achieve the settlement to which the government's tax lien attached. They thus fail to qualify for federal superpriority.

In sum, D'Amico is only entitled to priority ahead of the United States' tax lien if he meets the requirements of the federal attorney's fees superpriority provision. The superpriority provision only permits priority for attorney's fees representing "reasonable compensation for obtaining" settlement. 26 U.S.C. § 6323(b)(8). Because many of D'Amico's claims for funds have nothing to do with procuring the Barnetts' settlement, he is not entitled to priority for those amounts. Further, because the superpriority provision instructs the Court to look to local law to determine the validity of the lien in general, the Court reviews D'Amico's compliance with Louisiana

lien law for the amounts advanced. Because D'Amico failed to comply with Louisiana's client consent requirements for many of the advancements, they too are not entitled to priority over the United States' lien.

The Court next reviews the advancements made with client authorization to determine if they satisfy the lien priority statute. Those advancements total $56,262.73. *See* (Rec. Doc. No. 120-9). What the advancements were used for, however, is often unclear. The "Client Advance" form used by D'Amico to obtain client consent contains a section marked "Purpose" and states the client should "be specific" as to what the advancements were to be spent on "i.e., rent, school clothes for child/children, gas for doctor appt, ect." (*Id.*). The vast majority of the Barnetts' forms contain no level of specificity. Rather, most merely state as purpose "living expenses." Several others list no purpose at all—leaving the section on the form blank, or merely stating as the purpose "advance", "monthly advance", or "personal advance."

D'Amico himself can offer little explanation for the lack of specificity, and concedes he does not know why many of the advancements were requested or what they were spent on. When asked in deposition why such a high number of advancements were made between July 16, 2008 and August 8, 2008, D'Amico responded "[t]here may have been a situation where we were behind on

living expenses. I don't know. I don't want to speculate. I don't know. I don't know if it was a special need. I don't know." (Rec. Doc. No. 120-7 at 75). He went on to say in response to questioning on why further advances listed as "living expenses" were necessary:

> I don't know. That's what I'm saying. I don't know. It may have been some special need that came up because that happened from time to time. My recollection is general recollections over four years of representing them. There were times when they would come to me and beg me for something that they needed money for. . . . The point is if you ask me specifically what it is, I really don't recall what that was, but I do know that they had things that came up.

(*Id.* at 76).[17]

The purpose of the individual advancements is critical under both state and federal law. For lien validity purposes under state law, the Court must determine if the advancements were in fact the "*minimum sum necessary* to meet the client's, the client's spouse's, and/or dependents' documented obligations for food, shelter, utilities, insurance, non-litigation related medical care and treatment, transportation expenses, education, or other documented expenses necessary for subsistence." La.

---

[17] In justification of the sporadic nature of the advances, D'Amico stated "[i]t's not like I had a set salary and every month we knew this money was coming in. It's feast or famine. We ate what we killed." (Rec. Doc. No. 120-7 at 75).

Rule Prof. Conduct 1.8 (e)(4)(iv) (emphasis added).[18] Further, to determine federal superpriority, the Court must decide whether the amount is "reasonable," as required by the compensation provision of the superpriority statute. 26 U.S.C. § 6323(b)(8). Without any specificity for the purpose of the loans, the Court cannot capably answer these questions. Accordingly, the Court will exclude from D'Amico's claim for superpriority those client advancements where no specificity for the advancement is articulated in the Client Advance form.[19]

After a review of the advancement forms, the following list no specific purpose and are excluded from D'Amico's claim for lien priority:

February 1, 2008: $1,600

February 29, 2008: $1,600

February 29, 2008: $900

July 22, 2008: $4,500

July 25, 2008: $4,500

July 28, 2008: $4,500

April 17, 2009: $800

---

[18] D'Amico was also required to know the answer to this question prior to making the advancements, in order to satisfy his ethical obligations. La. Rule Prof. Conduct 1.8 (e)(4)(i).

[19] The Court is reluctant to apply superpriority to those advances that only list as their purpose non-specific "Living Expenses", but ultimately finds these advances satisfy the bare minimum requirements for reasonableness under state and federal lien law.

April 17, 2009: $450

May 1, 2009: $800

May 15, 2009: $800

June 29, 2009: $800[20]

July 16, 2009: $800

July 30, 2009: $800[21]

August 17, 2009: $800

September 16, 2009: $800

October 1, 2009: $800[22]

After deducting these amounts, D'Amico maintains a
superpriority amount for the advancement funds of $31,012.73.[23]
Added to that amount is the $17,563.15 in medical expenses for
William Barnett, for which D'Amico obtained the blanket
authorization. (Rec. Doc. No. 120-8 at 4).[24]

---

[20] This advancement for includes a specific advance of $958 for "monthly rent"
and an unspecific advance for $800.

[21] *Id.*

[22] *Id.*

[23] This represents a lien in the amount of $13,070 for Amelia Barnett's
interpleader funds, and a lien in the amount of 17,942.73 for William
Barnett's interpleader funds.

[24] The Court does not approve superpriority for Amelia Barnett's medical
expenses because she is not a signatory to the client consent form covering
medical expenses. Further, the Court does not find superpriority for various
expenses listed on D'Amico's most recent expense spreadsheet for vocational
rehab, physical therapy, and MRI expenses. Although these may also constitute
medical expenses, they appear in a section of the spreadsheet captioned "NOT
UPDATED." (Rec. Doc. No. 144-3 at Cell C40).

Next, the Court considers the matter of interest on the amounts lent to the Barnetts. D'Amico claims that he used his firm's line of credit to borrow money that he later advanced the Barnetts. Louisiana Rule 1.8 specifically permits attorneys to use their line of credit to advance funds. La. Rule Prof. Conduct 1.8 (e)(5).

However, the evidence D'Amico submits on the interest accrual is sparse—again coming solely in the form of a spreadsheet, listing various amounts, from various banks, during differing time periods. The amounts themselves are not listed to coincide with specific costs or advancements. This information is necessary, since the Court has only granted superpriority to the amounts listed above, and thus can only grant superpriority to the interest amounts associated with those specific advancements. Although the Court has already granted extensive briefing in this case, the Court will allow D'Amico one further round of supplementation on the interest issue. If D'Amico continues to claim superpriority for the interest amounts associated with the advancements the Court has granted superpriority, he must submit a detailed briefing, within 30 days of this order, with supporting documentation establishing the exact amount of interest incurred on those amounts granted superpriority. Any party wishing to respond to that briefing may do so within 14 days of D'Amico's filing. An alternative

solution would involve using the federal interest rate on the allowed total sum.

D'Amico also seeks superpriority for a separate $34,967.58 lien that he purchased from another law firm (the Bazou Law Firm) that previously represented the Barnetts in the damages litigation. The agreement between D'Amico and Bazou states that Bazou "expended monies and advanced amounts to or on behalf of [the Barnetts] as permitted by the Rules of Professional Conduct of the Louisiana State Bar Association." (Rec. Doc. No. 105-4 at 9). D'Amico now asserts that because he has been assigned the lien, he is entitled to the superpriority that he argues the Bazou firm would have enjoyed as a result of their work on the case pursuant to 26 U.S.C. § 6323(b)(8).

The United States offers no argument on the specifics of this lien, or the validity of D'Amico's assignment. The Court has no reason to question the transfer, and finds that D'Amico may assert lien priority.

However, the underlying amounts subject to the lien must still be reviewed to determine if in fact they qualify for superpriority. Upon review, several of the amounts suffer the same deficiencies as the amounts asserted in D'Amico's own lien claim, namely: (1) Several amounts listed are for unspecified advancements—without description as to why the advancements were needed; (2) Several amounts are for specific medical advances

and insurance premium payments, but without evidence that proper client consent was obtained; (3) Several amounts are listed as interest payments, presumably for loans obtained by Bazou prior to advancing funds to the Barnetts, but without specific information on the rate of interest or what item the interest relates to. *See* (Rec. Doc. No. 105-4 at 12-15). Accordingly, the Court is only able to grant priority to those amounts that represent particularized litigation expenses. That amount totals $3,962.68. Added to the figures above, the Court finds that D'Amico maintains a final superpriority to $52,538.56 of the interpleader funds.

**III. Fowler Rodriguez's Claim for Priority**

Lastly, the Court moves to the lien claimed by Fowler, Rodriguez & Chalos, LLP. Fowler Rodriguez claims $14,088.91 in lien priority for their previous representation of the Barnetts. *See* (Rec. Doc. No. 7-1). The United States concedes that Fowler Rodriguez has met the superpriority requirements of § 6323(b)(8) for $6,133.33 of the funds for litigation expenses. D'Amico has submitted nothing to contradict this fact. The Court finds Fowler Rodriguez is entitled to priority for this amount as litigation expenses.

However, the remaining claims of Fowler Rodriguez are not entitled to superpriority. Specifically, these claims represent insurance premium payments paid by the firm on behalf of the

Barnetts. Without further explanation as to why the payments were made or if they were done with client consent, the Court is incapable of concluding that the payments contributed to the creation of the settlement funds, and/or were compliant with Louisiana's client consent requirement. 26 U.S.C. § 6323(b)(8); La. Rule Prof. Conduct 1.8 (e).

Fowler Rodriguez has not filed their own motion for summary judgment on this issue, nor responded to either of the summary judgment motions before the Court. Accordingly, they have conceded the United States' view and are to be awarded only $6,133.33 from the interpleader funds.

## Conclusion

Accordingly, and for the reasons articulated above, **IT IS ORDERED** that:

Interpleader-Defendant D'Amico be **GRANTED LIEN PRIORITY** for **$52,538.56** of the interpleader funds at issue, plus any interest that has been earned on that amount while in the registry of the court, less any court administration fees;

Interpleader-Defendant D'Amico be permitted to submit a detailed briefing, within 30 days of this order, with supporting documentation establishing the exact amount of interest he has incurred as a result of the loans he made the Barnetts that the Court has granted superpriority. Any party wishing to respond to that briefing may do so within 14 days of its filing;

The law firm Fowler, Rodriguez & Chalos, LLP be **GRANTED LIEN PRIORITY** for **$6,133.33** plus any interest that has been earned on that amount while in the registry of the court, less any court administration fees;

The United States be **GRANTED LIEN PRIORITY** to the remainder of the interpleader funds after the issue of D'Amico's entitlement to interest is resolved, or after 30 days of the issuance of this order if no further briefing is filed.


New Orleans, Louisiana, this 3rd day of September, 2014.


                    UNITED STATES DISTRICT JUDGE